We'll hear argument next in Brown v. Cornell University. Thanks. Good morning, Your Honors. Michael Confusio on behalf of the appellants. Thank you for hearing the case this morning. I'd like to start off by just focusing on a couple of things with the retaliation claim, if I could. And maybe going through the district court's opinion, which is in the special appendix. Could you possibly get the microphone a little closer to yourself? I'm sorry, Your Honor. How's that? Better? If you look, there's three appellants in the case. So first, if we take Ms. Brown, she's the first one that the district court looked at. This is on page 22-25, basically, the opinion. First, the judge said, well, Brown didn't establish a prima facie case. We submit that was an error because the prima facie case is really kind of a de minimis standard. And we think that the evidence here is sufficient to get past the prima facie case. We think the real question here on appeal for the court is whether or not Brown could vault over that final threshold. Could a jury find that essentially it was a but-for cause, the desire to retaliate was a but-for cause? The main things I think the district judge did wrong in the case, really, are on . . . For example, on page 25, the judge talks about temporal proximity. It's a fairly straightforward case in this regard. The evidence shows that they did the survey and they made subsequent complaints of racial discrimination. This was from all five of the original plaintiffs, and I think there were some other members of the anesthesiology department that made them. The defendants were aware of it. Now, there's an issue, first of all, about whether or not the specific supervisor, Adams, she was the one that actually did the adverse actions. Was she aware of it? That's one of the things the judge says. The judge said, well, a jury can't find that Adams was aware of it. But I think if the court looks at the summary judgment evidence in the case, which I laid out largely on page 20 of my original brief, the appellant's brief, I think that evidence is enough for a jury to find that Adams was indeed aware of it, especially the fact that she was given the internal memorandum about the investigation and was asked to provide employee files about it. She was asked to provide what? She was asked to provide employee files. Like HR said, we have these complaints of racial discrimination, and she was asked to provide files from her employees back to HR about it. The fact is, Adams herself doesn't really have to expressly say, I knew specifically that it was Plaintiff Brown or Plaintiff Smith. She never learned who made those anonymous complaints. I think that a jury can find she did learn. That's my point, Your Honor. Wasn't there a stipulation that she never learned? No. No, there was no stipulation. Not a stipulation, but an admission that she never learned? No. No. I mean, and I understand Cornell's position is, and obviously it would be at trial again, hey, Adams didn't even know that it was Plaintiff Brown or Plaintiff Smith that complained. If this is not resolved by a stipulation or otherwise, what was the evidence from which a jury could reasonably have found that she knew? Yeah, so again, I think I tried to lay this out largely on page 20 of my original brief. So if you look, in early 2001, Human Resources communicated to Ms. Adams that it had received a complaint about the anesthesiology department. This is on page 20 of this brief? My original brief, yeah, the appellant's brief. Sorry. That's all right, Your Honor. Want me to keep going? Yes, please. Okay. Then she spoke with Angela Charter and Randy Glinski as part of this HR investigation, and they asked Ms. Adams to provide employee files for the investigation that HR was going to conduct. Then the following year, August 2012, Adams learned that HR received an anonymous written complaint, this was another complaint, alleging race discrimination in the department, but Adams said, well, she never learned who made the anonymous complaint. The next year, Adams does not know whether an investigation filed a written anonymous complaint, but again, HR directed to implement recommendations to Adams so she could improve communications. All of the evidence that you're pointing to on pages, I guess, 20 and 21 of your brief, and what you're alluding to here, is that the complaint was anonymous, and what you're saying is that a jury could still draw from the anonymity of the complaint that she knew exactly who had made these complaints. I think, actually, Your Honor— Is that the crux of the argument you're making? Not really, because the complaint was anonymous to Adams. Adams says, I didn't know who made it, but HR knew who made the complaints. Okay, the initial survey, I believe, was anonymous. Aren't you claiming that Ms. Adams was the ultimate decision maker, at least with respect to Ms. Brown? She was. So here's what the evidence, I think, shows that a jury could find. The initial survey was anonymous, but eventually, as the evidence shows, the plaintiffs in this case, including the appellants, drafted complaints to HR. They themselves personally met with HR, so HR knew who was complaining about race discrimination. It wasn't anonymous to HR. The issue is, can the jury take that evidence and say, well, Adams was asked to give employee files, okay, and asked to implement corrective procedures within her department to address race discrimination complaints. Could they find that Adams knew exactly who made the complaints, as HR knew? And I think that they can make that conclusion. Could you turn to the— No, no, go ahead. Please. How many people worked in this department that Adams supervised? I talked a little bit about that in the brief, too. It looked like there was about twenty-five to thirty, Judge. How many were persons of color? It looked like there were maybe about eight to ten, and Adams relayed who they were when she was asked there to deposition. So Adams was aware of who the minorities were in the department. You know, this wasn't a 500-person department.  I'm sorry, Judge, go ahead. Was there one complaint or more than one complaint where HR knew who the complainant was? Say that again, Judge. I'm sorry. Was there one complainant whose identity was known to HR or more than one? More than one. How many? I think it was the five plaintiffs that were originally in the case, so that would include the three appellants that I have. Okay.  Sure, Your Honor. Were you going to ask me a question, too? So would you just turn briefly to the Karina Rustia affidavit? Tell me why you think the district court was wrong with respect to analyzing the effect of that affidavit, because that may be your most powerful argument, at least with respect to Ms. Brown. Yeah, no, I understand that. I think what the judge did was he looked at the affidavit and the deposition testimony and said, well, Rustia, her belief essentially that this was the product of racial discrimination, that that part of it was essentially without basis and should be excluded. I don't think that's the germane part, though, of her testimony. The germane part is her testimony that in the 2013 evaluation for Brown, that suddenly Adams interjected herself into the process, and it changed significantly. And I think this is one of the critical areas the judge erred in. He said it wasn't a significant change. It was significant because according to Rustia, if the jury believes her, before in prior years, you know, they had gathered the recommendations from the people, the doctors that Brown worked for, and in 2013 it was the same thing. She got all positive reviews, but then Brown interjected and said, no, it can't just be about that. And essentially the end result was. The 3.5 number remains the same from one year to the next. On Brown, I'm not sure if that was true with respect to Brown. I think that was actually somebody else. Brown's actually was one of the ones that did go down. It went down. Yeah, it went down significantly. So to answer your question, Your Honor, I know I'm out of time. The Rustia testimony is significant for the factual testimony about this was a change procedure that suddenly Adams was invested directly in the process and directed Rustia. Basically, you're making the evaluation lower than. The fact that Adams had problems with Brown's administrative ability, and that seems to be, I mean, if you eliminate from Rustia's testimony, the part where she is expressing her belief without any evidentiary basis that it was based on retaliation or race discrimination. But the fact that the supervisor Adams had problems with the administrative abilities of Brown, that these were reflected, she saw to it that these were reflected in the evaluation and resulted in lower evaluation. That doesn't say anything about an illegitimate cause for the reevaluation. Well, I agree with Your Honor that it doesn't in that regard if the jury accepted that conclusion. But the fact is the evidence shows that because Brown changed the protocol so significantly, a jury could conclude that something changed, and the reason was because she retaliated against her. Thank you. Thank you, Your Honors. We have time for rebuttal, so we'll hear from your colleague here. May it please the Court, my name is Ben Stockman. I represent Apelli's Cornell University and Kristen Adams in this matter. Pleasure to be here before you all today. I'd like to just make one correction to the account of the record that my colleague just made. The anesthesiology department over which Apelli, Kristen Adams, oversaw the administrative staff actually had approximately between 50 and 60 employees total. Of that staff, between 20 and 30 were non-exempt employees. They were not what kind of employees? Non-exempt, in other words, hourly employees. The relevance of that fact is simply that the appellants in this case were non-exempt employees, and for the purposes of the retaliation claim that was summarily dismissed below, the protected activity, the anonymous complaint or complaints in this matter, were submitted to Cornell, HR, and other executives within the higher university administrative, president of the university, the dean of Weill Cornell, who were all outside of the anesthesiology department. Those complaints were signed, the non-exempt staff of the anesthesiology department. So, contrary to what my colleague has just stated, you cannot, from this evidentiary record, boil down the anonymous complaint to eight or ten minorities. That's not in the record. But the question was, what percentage of the employees supervised by Adams were minorities? And your adversary gave an answer, eight or ten out of 30. And you're saying, first of all, the overall number is 50 to 60 rather than 30, is that right? Correct, Your Honor. And how many of them are minorities? There's no record on that, Your Honor. The plaintiffs did not take discovery on that issue. So, you're saying that the statement made to us by your adversary is without basis in the record, that eight or ten, that there's no basis for that? I'm saying that it's an imprecise statement of what the record actually reflects, and I'll clarify. What the record reflects is the question that was posed to Kristen Adams at her deposition was, can you identify minorities other than the plaintiffs in this case who work in the anesthesiology department? And off the top of her head, she listed about four or six additional. They've construed that testimony. That's all she said. And the question wasn't, how many minorities might have been behind this anonymous complaint? The question was, how many other minorities are there in the anesthesiology department other than the three plaintiffs? She identified four to six off the top of her head, and she said there are, I don't want to misquote her testimony. She identified four to six, but her testimony was clear that that was off the top of her head, and she didn't have a full picture in her mind and couldn't identify all of them off the top of their head. So that's where his number is coming from. Adams testified, did she, that she did not know who had made the complaints? Correct. She testified, and there is no dispute in the record about that. And the record is clear that the five plaintiffs initially went to the human resources department after the employee satisfaction survey was conducted. And to be clear, that satisfaction survey was not about whether there's race discrimination in the department. It was about, are you happy in your job? And there were various questions that were conducted by an outside consultant, the typical workplace satisfaction survey. But it eventually became a claim about race discrimination. Well, in the plaintiff's mind, it did. So they went to HR, which was their right. They spoke with an HR representative and said, we have concerns about advancement in the department. It seems that white employees are being advanced at a higher rate than minority employees. To interrupt you for a second, is it correct that the opposite was true, that statistically employees of color were being promoted at a greater rate than white? That is correct, Your Honor. I want to make one clarification on that just so we can be clear on the record. There is no evidence in the record that white employees were promoted in greater numbers overall in the department than minority employees. The only record regarding percentages of promotions in the record is that for promotions that would have been promotions for the appellants or the plaintiffs, in other words, they were in level 5 compensation. Level 5 to level 6 is what we're talking about. Correct, Your Honor. And that should be the focus, right? Correct. And for those types of promotions at all relevant times, 80% of those promotions went to minorities, including the plaintiff, Lisa Cabrera, who has not taken appeal, despite Judge Etkin's decision dismissing her claims. And that's a massive fact. They don't address it. The district court, to its credit, didn't rely entirely on that. I submit that this court could. But Judge Etkin, nevertheless, went through every single various theory that the plaintiffs set forth, and he correctly, in my opinion, stated that the complaint lacked clarity as to whether they were alleging that a failure to promote theory, which contains a slightly different standard than your various disparate treatment theories, but he went through all of them. This was a very large evidentiary record because there were five plaintiffs making all sorts of allegations about all sorts of things that they, frankly, weren't educated on. The comparators that they identified to try to make out their disparate treatment claims, they all admitted under testimony and deposition that they knew essentially nothing about these comparators. They didn't know what their qualifications were. They don't know when they were promoted. They don't know why they were promoted. They don't know who decided to promote them. And they had simply, their testimony essentially boiled down to, this person was white and this person was promoted, therefore discrimination. Judge Etkin went through all of that evidence and, in a meticulous opinion, addressed all of these theories, even though we had facts that 80 percent of the relevant promotions went to minorities. Adams promoted four of the five plaintiffs in this case. Now, there's no dispute that the plaintiffs were frustrated with what they perceived to be stagnated careers. They were promoted, and then they were at level five positions for quite some time. You say that 80 percent of the relevant positions went to minorities, and you refer to minorities. What does that mean? So, that is a good question, Your Honor. And I, from the plaintiff's perspective, that could be. I don't know what that means. I agree with you, Your Honor. So, the self-identified races of the five plaintiffs, and we only have three appellants here, but were Lisa Cabrera self-identified as Hispanic, Keisha Brown self-identified as African American, Yvette Francis self-identified as African American. We know the defendants, right? Yes. Okay. And Marlene Augustine. We know who the plaintiffs are. Yes. So, Marlene, should I not continue that yet? The 80 percent breakdown. Yes. So, oh, I'm sorry. Yes. So, of the 80 percent promotion, so one was Lisa Cabrera, Hispanic. One was Maria Killian, white. You'll have to forgive me. I'm going to forget the names of the others. But there was a Hispanic male, and then there were two African American females. So, two African Americans, two Hispanics, and one white. Correct. And that's the 80 percent? That's the 80 percent. Okay. In my remaining time, I'd like to just address the retaliation points that my colleague here raised, and just correct the record. To be clear, the record, there is no evidence in the record that Kristen Adams ever knew that any of the appellants were behind the anonymous complaints. In fact, she didn't know until this lawsuit was filed that they were behind it. But to Judge Atkins' credit, he didn't simply rely on that legally dispositive issue alone. He went through Ms. Rustia's testimony, and to give just a quick background on her affidavit versus testimony, her affidavit was produced during discovery, was drafted by the lawyer who handled the case for the plaintiffs below. She admitted it, her deposition, it was drafted by that lawyer. That doesn't matter. It doesn't matter, Your Honor. But I would argue that the content of that affidavit was clearly legal advocacy. But for purposes of summary judgment, that doesn't matter. I will move on. Her deposition testimony was the best evidence as to what information she has that's relevant to this case. And she was asked what the basis was for her belief that there was discrimination or retaliation by Kristen Adams. She said that essentially it was hearsay gossip by the plaintiffs themselves. That was her answer. Anything else? No. So that is the basis for, that is the true basis for. There is law to the effect that affidavits drafted in defense of, against summary judgment can't properly contradict deposition testimony. That's correct, Your Honor. And I would submit here that the best evidence from Karina Rustia, and I see that my time has expired. On the other hand, you might be slightly overstating it in saying that there's no evidence that Kristen Adams knew who it was. The issue is whether one can draw an inference from the timing, from the fact that the people at HR knew, and that Kristen Adams, that Adams intervened to give a lower rating to Brown than she had given in the past following Brown's participation in the complaints against Adams. May I briefly respond, Your Honor? Yes, please. So Karina Rustia testified, although she stated in her affidavit that Ms. Adams intervened and was outside protocols for that Ms. Brown's performance evaluation, in fact, Ms. Rustia's deposition testified that it was common practice for Ms. Adams to review performance evaluations and to provide input into performance evaluations all the time. She said Ms. Adams had her hands in everything. If there was any issue with Ms. Adams, it was that she was an overly present, high-level administrator. She was involved in- Really, your fundamental point about the Rustia affidavit, I take it, is that the affidavit, as was further elaborated in Rustia's deposition, is not admissible. That is, it rests on hearsay, and that's really what it reflects. Correct, Your Honor. The only thing I would add to that is even if this Court were to deem it admissible or best evidence, all it says is that Ms. Adams intervened and made sure that Ms. Brown got a bad review, and it's undisputed that Ms. Brown had performance problems. So the statement, got a bad review, could equally apply to- You don't even have to wade into that. No, Your Honor. I'm a little confused. I don't understand. I understand that a lot of what Rustia said is not competent evidence, but why isn't it competent evidence when she says that Adams told me that the review should reflect Brown's poor administrative abilities, and that Adams told Rustia to do certain things with respect to the review? Why is that not admissible evidence? I would say that the statement that Ms. Adams insisted that Ms. Brown's poor performance be reflected in her review is admissible evidence. When Ms. Rustia was asked, she was handed the performance review at issue. She was asked, did you draft this performance review? She said, yes. So what edits did Kristen Adams make to this performance review? I don't know. What edits did they make? Can you identify a single edit in this performance review that Kristen Adams made? Judge Etkin noted this. The only edit that she pointed to was that Kristen Adams told Karina Rustia, make sure to include that Keisha Brown needs to calendar her appointments and keep track of her faculty assignments because that was the performance issue. She was not keeping up with faculty assignments. I've gotten the impression that, and I'm not sure whether I'm right about this, that Adams told Rustia that the performance review should reflect more heavily the administrative deficiencies in Brown's performance than the good reviews that she got from faculty interaction. Am I wrong about that? You're not wrong. That was what the affidavit said, Your Honor. The testimony was slightly different, as I've described. We'll hear from him. Very briefly, Your Honor, I know you spent a lot of time on this case. I would just say . . . You've got two minutes. All right. I'll be hopefully quicker than that. I mean, one of the main things is, and I appreciate the arguments my adversaries make, but I think it's important on summary judgment. You have to view the evidence in the light most favorable to the plaintiff, and there are definitely certain arguments that I think Cornell makes that essentially cite what their evidence, they think their evidence is. I mean, it's not really germane. You're really looking for absence of proof. The one absence I think the Court's definitely concerned with, and rightfully so, is, well, how do we even know that a jury could find that Adams knew that it was my clients, essentially, that made these racial discrimination complaints? The best I could do, Your Honor, is, you know, you look again at . . . This is my initial brief at pages 9 and 10. This is coming right out of Adams' own mouth about what she knew. You know, first of all, with respect to how many people were in the department, Adams testified that, quote, maybe 30 members comprised a non-exempt staff group in the anesthesiology department. And then she said in December 2012, African-American and other minorities employed in the department included, and she named who they were, and they included the plaintiffs. So, I mean, there weren't that many people to choose from. The point is, a plaintiff . . . I'm sorry, Judge. She said the African-Americans included these, but that's different from saying that that was the entire list. Agreed. Totally agreed, yeah. But she was aware that my clients were among them. And, you know, if she says there's 30 non-exempt staff, that's not really a lot of people to choose from. Here's what I would say. Well, really, you know, I think we instruct juries all the time. They have to be satisfied of facts in a civil case by a preponderance of the evidence. Now, how do you tag Adams with awareness that Brown was one of the complainants if the odds are one out of three? Well, I mean, you know, again, Your Honor, the fact that HR knew this is a relatively small department, she was asked to give files, and the fact that the complaints lasted, don't forget, over three years, Judge. How many files was she asked to give? She was asked to give employee files from HR. That's in the record. And, again, I think that's on page . . . Employee's files or particular people's files? I don't think the record makes that clear. So, she was asked to give files. Maybe she was asked to give files about other people. Maybe she was asked for all files. Well, if it arose, Your Honor, the record does show it arose out of the discrimination complaints. So, you know, I think a jury could conclude that the files would have included the complaints. Here's the bottom line. You know, retaliation claims are this, right? We have cases sometimes where somebody says, hey, I made a complaint, and I was retaliated against, and they can't even show that they made the complaint, or they can't show that the defendant knew about it. This isn't that kind of a case. This is a survey. This lasted over three years. They met with HR personally. Is it correct that the survey was entirely anonymous? Say it again, Your Honor? Is it correct that the survey was entirely anonymous? The initial survey was, but when the . . . But, Your Honor, when the plaintiff sat with the HR people, it wasn't anonymous at that point. They knew exactly who it was that was making racial discrimination complaints. And that's significant. The fact is, that and the timing of suddenly when things changed, I think that's enough to allow a jury to get to the case. Thank you for your quick rebuttal. Thank you, Your Honors. We'll reserve the decision, and we'll . . .